**UNITED STATES of America, Appellee,**

v.

**Arthur Louis GILLIS, a/k/a Louis Gillis, a/k/a Louis Arthur, Appellant.**

**No. 84–5190.**

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1985.

Decided Sept. 18, 1985.

Paul W. Spence, Deputy Federal Public Defender, Baltimore, Md., (Fred Warren Bennett, Federal Public Defender, Baltimore, Md., on brief), for appellant.

Robert J. Mathias, Asst. U.S. Atty., Baltimore, Md., (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and GORDON, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

GORDON, Senior District Judge:

Appellant Arthur Louis Gillis appeals his conviction on all counts of a five-count indictment. Count one charged the defendant with the interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. Count two charged him with selling or disposing of a stolen motor vehicle which had been transported in inter-

state commerce in violation of 18 U.S.C. § 2312. Counts three, four, and five charged appellant with interstate transportation of stolen and forged securities in violation of 18 U.S.C. § 2314. We have carefully considered appellant's claims of error and, finding them to be without merit, affirm the result below.

Defendant's conviction arose from events occurring during the period from January through March 1983. Appellant, using aliases, represented himself to be a used car wholesaler to private citizens who were selling their cars through the newspapers. Appellant purchased the cars using checks drawn on accounts with insufficient funds and usually on out-of-state banks, and also used various artifices to create the appearance that the checks were certified. After obtaining good titles to the cars, and before the checks were returned for insufficient funds, the appellant sold the cars to legitimate used car dealers.

Counts one and two of the indictment involved the purchase in Maryland and subsequent sale in Pennsylvania of a 1978 Corvette. The defendant purchased the car on January 4, 1983, with a $9,000.00 check that was ultimately returned for insufficient funds. Within a few days after the purchase, the defendant resold the car to an automobile dealer in Pennsylvania for $4,500.00.

Following the transaction in Maryland, the defendant traveled to South Carolina where he obtained a motor vehicle dealer's license in the name of Dealers Exchange, rented a building to be used as an office front, purchased an insurance binder as required under state law, and opened bank accounts in the name of Dealers Exchange.

In March 1983 the defendant returned to Maryland and engaged in two additional transactions. He purchased a 1978 Datsun 280Z and a Lincoln Continental with checks drawn on the account of Dealers Exchange

at the South Carolina National Bank. Both checks, in the total amount of $14,700.00, were returned for insufficient funds. The transportation of these checks in interstate commerce formed the basis for counts three and four of the indictment. After obtaining good title to both of these cars, the defendant resold them immediately to an auto dealer in Bel Air, Maryland for a total price of $12,500.00. The initial payment check from the dealer of $8,300.00 was deposited in an account of the defendant at the Central Bank of the South in Birmingham, Alabama, which formed the basis for count five of the indictment.[1]

Following his arraignment, the defendant informed the district court of his intention to represent himself and requested a hearing under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 49 L.Ed.2d 562 (1975). After an examination of the defendant and a hearing, the Court determined that the defendant was competent to represent himself at trial and the Office of the Federal Public Defender was appointed as standby counsel.

Prior to trial, Gillis filed a notice of intent to rely upon a defense of insanity. When the government learned that Gillis's insanity defense would be based upon a theory of pathological gambling, the government filed a Motion in Limine seeking to exclude all such testimony on the ground that, as a matter of law, pathological gambling does not fall within the ambit of the American Law Institute (ALI) test for legal responsibility and does not provide a sufficient basis for a defense of insanity. After a pretrial hearing, the trial court issued a Memorandum and Order dated May 4, 1984, in which it expressed its tentative decision to allow evidence of pathological gambling to be heard by the jury and to address the government's contentions within the context of jury instructions.

---

1. Appellant purchased two other cars in transactions in which the sellers received their full purchase price. In February and March of 1983, appellant purchased two cars in Georgia for $14,500.00. In both instances, the sellers took precautions to assure that the cars would not be released until either the account balance had been verified, or the defendant had provided a certified check.

On April 30, 1984, a jury was empanelled and the case proceeded to trial. At trial, appellant did not deny the acts of purchasing and reselling the cars, but argued that he had no intent to defraud the victims. Appellant attempted to rely on a dual defense of lack of specific intent and insanity, both of which were based primarily on his gambling problems. Although appellant did not take the stand himself, he attempted to introduce evidence of his involvement in a legitimate used car business which, because of his numerous personal problems, did not prove successful. Appellant relied principally on his pathological gambling, but also introduced evidence of marital problems, problems with his parole supervision, "post-traumatic shock," and employment problems.

Appellant called two expert psychological witnesses. First he called Dr. Custer, who had examined appellant and testified for him in a 1980 trial.[2] In that case, the appellant was charged with kidnapping and interstate transportation of a stolen motor vehicle and Dr. Custer had testified that Gillis suffered from pathological gambling disorder and was not, in his opinion, criminally responsible for his actions. Although Dr. Custer had not examined appellant since the 1980 trial, he testified that Gillis had not been treated for his gambling, and therefore still suffered from the disorder.[3]

Appellant next called Dr. Moravec, who had examined him solely in connection with the subject case. Dr. Moravec concluded that appellant suffered from a pathological gambling disorder, and was unable to diagnose any secondary disorders with any degree of medical certainty. On the basis of his pathological gambling, concluded Dr. Moravec, appellant suffered a mental disease or defect and was unable to conform his conduct to the requirements of the law.

Following the testimony of Drs. Custer and Moravec the court determined that pathological gambling, in and of itself, without proof of some other disorder, did not constitute a mental "disease or defect" under the ALI definition of insanity, and instructed the jury accordingly. The government later called its expert, Dr. Michael Spodak, to testify in rebuttal. Dr. Spodak agreed that appellant was a pathological gambler, but concluded that the disorder did not cause appellant to lack the capacity to conform his conduct to the requirements of the law. At the conclusion of the evidence, the court repeated to the jury its instruction that pathological gambling did not satisfy the ALI test.

The jury returned a verdict of guilty on all five counts of the indictment, and appellant was sentenced to serve eight years to run consecutively with any time the appellant was then serving. The court also ordered the appellant to make restitution totaling $23,700.00 pursuant to 18 U.S.C. § 3579.

Appellant noted his appeal, and counsel was appointed from the Office of the Public Defender to represent him. Appellant subsequently filed a motion to proceed *pro se*. An order was entered at the direction of Judge Wilkinson denying the motion, but allowing the appellant to file a supplemental brief addressing any issue not raised by counsel. During the course of preparation of the trial transcript, it was discovered that a one-hour portion of a non-evidentiary pretrial hearing on April 24, 1984, had been inadvertently erased. Pursuant to Rule 10(c) of the Federal Rules of Appellate Procedure, the parties filed their proffered statements of their recollections of what occurred during the missing portions of the hearing. By Memorandum and Order dated January 23, 1985, the district court certified for inclusion in the record its determination of what took place during the period missing from the tape.

---

2. *United States v. Gillis*, 645 F.2d 1269 (8th Cir.1981). Appellant was under parole supervision when the transactions presently at issue took place.

3. Dr. Custer was consulted with respect to appellant's treatment while under parole supervision. His recommendations were, for the most part, ignored by appellant, whose condition went largely untreated.

Appellant raises four issues for review on appeal. First, he alleges that the trial court committed error when it permitted the government to elicit from Dr. Custer, on cross-examination, testimony concerning the events surrounding appellant's 1980 conviction for kidnapping and interstate transportation of a stolen motor vehicle. Second, appellant claims that, because a portion of the record was inadvertently erased, effective appellate review is denied and a new trial warranted. Third, appellant claims that the trial court committed reversible error by instructing the jury that pathological gambling, by itself, did not provide a sufficient basis for an insanity defense under the ALI test. Fourth, appellant claims that this court improperly denied his motion to proceed on appeal *pro se.*

■ Appellant's first claim of error is the admission, over objections, of testimony by Dr. Custer concerning the facts surrounding the appellant's 1980 conviction for interstate transportation of a stolen motor vehicle and kidnapping.[4] The trial court, in preliminary hearings, had determined that the government would not be allowed to introduce in its case-in-chief the circumstances of that conviction. The court warned. Gillis, though, that if Dr. Custer testified to an opinion based on his 1980 diagnosis, the government would be allowed on cross-examination to elicit the basis of that opinion, even if that included the facts of the prior trial.

At trial the appellant called Dr. Custer, considered the foremost expert on patho-logical gambling disorder, to testify as his expert witness. Although Dr. Custer had not examined Gillis since 1980, he testified that appellant suffers from pathological gambling, and stated that he based his conclusion upon his 1980 diagnosis plus the fact that Gillis has since failed to receive proper treatment. The trial court, out of the presence of the jury, carefully questioned the witness about the basis of his opinion. The court concluded that appellant's specific conduct leading to his 1980 conviction formed an integral part of the basis for the Doctor's diagnosis.[5] The court, therefore, allowed the government to inquire on cross-examination into the specific conduct involved, *i.e.,* stealing a car, transporting it interstate, kidnapping the car's owner, and carrying a weapon throughout the crime. The government avoided, at the direction of the court, any mention of the outcome of Gillis' previous trial.

Appellant argues that the trial court abused its discretion under Fed.R.Evid. 404(b) and 403. Appellant contends that the cross-examination was unduly prejudicial because it informed the jury that the appellant had previously been charged with a similar crime and had unsuccessfully attempted to rely on the same defense.

Article VII of the Federal Rules of Evidence controls opinion evidence and expert testimony. Fed.R.Evid. 705 provides that:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the

---

**4.** According to Dr. Custer's testimony, Gillis' prior conviction resulted from a rather bizarre car theft, in which the owner refused to leave the car and thus went *riding off with Gillis.* During the course of the crime, Gillis supposedly allowed his victim to stop a number of times to attempt to telephone his daughter to tell her he would not be able to give her a ride home from the hairdresser. The victim subsequently bought Gillis lunch and allowed him to use his driver's license when they were stopped by police. (Joint Appendix at 145–148).

**5.** Question by the court: And those incidents were an integral part of your forming your opinion with regard to Mr. Gillis' disorder; correct?

Dr. Custer: Correct.
The Court: And they're also an integral part of your forming your opinion with regard to the continuing alleged disorder of Mr. Gillis; correct?
Dr. Custer: Yes.
(J.A. at 109–110)
The Court: And was the particular kidnapping, the specific type of crime, i.e., kidnapping, one of the reasons that led you to believe that he had these personality traits, plus the compulsive gambling, which added up to mental disease or defect within the standards of the ALI test?
Dr. Custer: Yes, it was part of that.
(J.A. at 119)
A similar discussion took place at J.A. 121.

underlying facts or data, unless the court requires otherwise. The expert, may in any event be required to disclose the underlying facts or data on cross-examination.

Clearly, under Rule 705, cross-examination about the facts underlying Dr. Custer's opinion was proper. However, Rule 705 does not end the inquiry. In determining whether to allow an expert to testify to the facts underlying an opinion, the court must inquire whether, under Fed.R.Evid. 403, the testimony should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice.

The district court properly made this inquiry, discussed it on the record, and did not err in allowing the government to cross-examine Dr. Custer concerning the facts underlying his 1980 diagnosis. We have recognized the importance of developing the factual basis of psychiatric testimony regarding mental responsibility, *see, e.g. United States v. Wilson*, 399 F.2d 459, 462 (4th Cir.1968), and have granted prosecutors wide latitude in cross-examining expert witnesses on the issue. *United States v. Retolaza*, 398 F.2d 235, 240 (4th Cir. 1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 646, 21 L.Ed.2d 576 (1969). In the subject case appellant was conducting his own defense before the jury, yet claiming to be suffering from a mental disease or defect based on a three-year old diagnosis. It is important that the factfinder know the basis of Dr. Custer's diagnosis in order to attribute to it the proper credibility and weight. Since Dr. Custer testified that the specific type of conduct behind Gillis' prior conviction was taken into account in forming his diagnosis, that conduct was clearly relevant.

Appellant argues that, however relevant, the testimony was so prejudicial that the trial court abused its discretion by allowing it before the jury. We disagree. The government carefully avoided any reference to the outcome of Gillis' previous trial.

If the jury knew that Gillis was found guilty of similar crimes and that his insanity defense had failed, it was due to his repeated references to himself as being on parole. Appellant cannot claim prejudice from his own revelations.

In addition, the entire area of questioning could easily have been avoided by the appellant. The court had prohibited the government from eliciting this testimony in its case-in-chief, and had warned appellant of the dangers of opening the door by asking Dr. Custer's diagnosis. Appellant could simply have relied on the diagnosis of his other expert, Dr. Moravec. Or, appellant could have been reexamined by Dr. Custer so that the 1980 evaluation would not have formed the basis for his current diagnosis. Once Gillis asked about the 1980 diagnosis, however, its factual basis became relevant and proper cross-examination and, under these circumstances, the trial court did not abuse its discretion by allowing the government to proceed with its cross-examination.[6]

▬ Appellant next alleges that, because a portion of the trial transcript is missing, a new trial is warranted. 28 U.S.C. § 753(b) provides for the recording of a verbatim transcript of trial proceedings in order to safeguard a defendant's right to appellate review. *United States v. Taylor*, 303 F.2d 165 (4th Cir.1962). The lack of a record does not warrant reversal, however, as long as the reviewing court is satisfied that no error occurred at trial. *See United States v. Snead*, 527 F.2d 590 (4th Cir.1975). The appellant must demonstrate that the missing portion of the transcript specifically prejudices his appeal before relief will be granted. *See id.* at 591 (no relief granted since no specific prejudice alleged).

▬ In the subject case, a portion of a non-evidentiary pretrial proceeding was inadvertently erased from the transcript.

6. Although it would have been proper for the trial court to give the jury a limiting instruction concerning the testimony about Gillis' previous crimes, none was requested, and the failure to give such an instruction did not affect a substantial right and, thus, was not error. Fed.R. Cr.P. 52(a).

When it was discovered that the transcript was incomplete, the parties, according to Fed.R.App.P. 10(c), submitted their differing recollections of what was missing, and the trial court set forth its account of the missing proceedings and approved it for inclusion in the record on appeal.

Although the appellant disagrees with the accuracy of the trial court's recollection of the specifics, it is clear that the missing portion of the transcript concerned preliminary discussions of appellant's insanity defense and the testimony of Dr. Custer. Appellant alleges that the government promised during those proceedings that, under no circumstances would it attempt to elicit evidence of appellant's prior conviction and its surrounding circumstances. The government contends that no such agreement was made, and the trial court concurs with the government's version of the pertinent discussions.

We are completely satisfied that there is no prejudice to appellant because this small portion of the transcript was obliterated. It is clear that there was no testimonial or documentary evidence received during that hearing, and that any rulings were merely preliminary and were reargued during the trial. The focus of the missing discussion was the testimony of Dr. Custer as it related to Gillis' insanity defense, and the evidentiary issues it would raise. The cross-examination of Dr. Custer at trial accounts for over fifty pages of transcript, much of which is dedicated to those very same issues: the relevance of his testimony to the insanity defense, and the proper scope of cross-examination. The positions of the parties are clear and complete, as is the rationale of the court in its rulings. Because any rulings that might have been included in the missing transcript were merely preliminary, and because this court has been able thoroughly to examine the propriety of the trial court rulings, there is no indication that having the missing transcript would assist the court in its review. Appellant has failed to demonstrate any prejudice to his right to a complete appellate review.

Appellant's third claim of error is that the trial court improperly instructed the jury that pathological gambling disorder, by itself, did not amount to insanity under the ALI test. After Dr. Custer testified, Dr. Moravec was called by appellant to testify about appellant's gambling disorder and to express an opinion of the appellant's "insanity." At a bench conference, the court reiterated the position it had expressed during pretrial proceedings that compulsive gambling did not amount to a "disease or defect" within the ALI definition, and that, absent proof of some additional mental disease, the court would give the jury a special instruction. The trial court reasoned:

> ... this doctor has not testified what the mental disease or mental defect was other than compulsive gambling and if it is simply compulsive gambling, I am going to tell the jury that that is not sufficient grounds....
>
> . . . . .
>
> Now, if there is another mental disease or defect plus compulsive gambling, that is something else.
>
> I will let the witness answer the question [whether there was a mental disease or defect] but I am going to tell the jury, when I instruct the jury, what I have just said, ...
>
> The reason why is that the jury may— has the right to conclude that on the basis of what they have heard, there is a mental disease or a mental defect, whether or not this doctor thinks there is one.

Joint Appendix (JA) at 199–201.

Appellant proceeded to ask Dr. Moravec whether the appellant suffered from a mental disease or defect, and the doctor answered yes, appellant suffered from pathological gambling. Dr. Moravec stated that there was no other diagnosed disease, but that there were symptoms of post-traumatic shock syndrome. Dr. Moravec then testified that, in his opinion, appellant "was unable to conduct his behavior to the requirements of the law as a result of the mental disease or defect."

At this point the court instructed the jury:

Compulsive gambling or pathological gambling, taken together with some other mental disorder, may well as a matter of law be sufficient to constitute in their sum total a mental defect or mental disease which meets the ALI test, but compulsive or pathological gambling in and of itself, without more, is not sufficient.

JA at 212. In its charge to the jury at the end of the evidence, the court repeated this instruction.

In 1968, this Circuit adopted the American Law Institute test for insanity. *United States v. Chandler*, 393 F.2d 920 (4th Cir.1968) (en banc). That test is:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(2) The term "mental disease or defect" do[es] not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

*Id.* at 926; *United States v. Gould,* 741 F.2d 45, 47 (1984).

■ The person attempting to rely on the defense bears the burden of producing sufficient evidence to raise the defense. "Slight" evidence is sufficient to raise the issue, and shifts to the government the burden of proving beyond a reasonable doubt that the defendant is criminally responsible under the ALI test. *Gould,* 741 F.2d at 47, (*citing Hall v. United States,* 295 F.2d 26 (4th Cir.1961); *United States v. McGirr,* 434 F.2d 844 (4th Cir.1970)).

■ The issue before us is whether the district court erred by instructing the jury that, as a matter of law, pathological gambling could not qualify as a mental disease or defect under the ALI test. We conclude that the trial court did not err.

We recently considered a closely related question in *United States v. Gould, supra.* In *Gould* we were faced with the proffer of pathological gambling as a "mental disease or defect" in an attempt to exculpate from criminal responsibility a defendant charged with bank robbery. The trial court instructed the jury that, as a matter of law, pathological gambling is not a disease or defect within the meaning of the ALI test, and the defendant was found guilty. We affirmed. Although we did not decide whether pathological gambling is a "mental disease or defect" under the ALI test, or whether it might, in relation to certain conduct, constitute an effective insanity defense, *id.* at 50, we did establish an analytical framework for determining the relevance of evidence of such newly-identified disorders. It is within this framework that we examine the issue presented today.

We began in *Gould* by examining precedent from the Eighth and Second Circuits. Both courts had recently faced the question whether, under the ALI test, pathological gambling could form the basis for an insanity defense. *See United States v. Torniero,* 735 F.2d 725 (2d Cir.1984); *United States v. Lewellyn,* 723 F.2d 615 (8th Cir. 1983). Each court held that evidence of compulsive gambling could not be considered by the jury, although neither decided that compulsive gambling could never constitute a mental disease or defect. Rather, as we noted in *Gould,* each focused on "whether the evidence sufficed under the appropriate procedural-evidentiary test to establish the requisite causal connection between the 'disorder' and the specific offenses in issue, a causal connection that is required by the 'as a result of' language in the ALI test." *Gould,* 741 F.2d at 48; *see Torniero,* 735 F.2d at 731–32; *Lewellyn,* 723 F.2d at 617–18.

In determining whether the jury could consider evidence of pathological gambling, the *Lewellyn* court applied principles controlling the admissibility of scientific evidence. It found that the evidence offered to prove the causal relation between the gambling disorder and the defendant's alleged inability to resist embezzlement and mail fraud was not sufficiently shown to be "generally accepted" in the relevant medi-

cal discipline. 723 F.2d at 619. The *Torniero* court took a slightly different approach to reach the same result. It treated the issue as one of foundational relevance under Fed.R.Evid. 401, and held evidence of the gambling disorder properly excludable because a causal link between the defendant's disorder and the crime charged—transportation of stolen goods—had not been adequately shown to have "substantial acceptance" in the relevant discipline. 735 F.2d at 732.

Our own reasoning closely followed that of the *Torniero* court, and we determined in *Gould* that "the question whether a novel insanity defense of this type may properly be considered is properly first addressed as one of relevance under Fed.R.Evid. 401, applying a special test appropriate to the peculiar nature of this wholly exculpatory defense." *Gould,* 741 F.2d at 48. This "special test," we held, was "whether the general scientific hypothesis of a putative causal relation between specific disorder and specific conduct has *substantial acceptance* in the relevant discipline." *Id.* at 49 (emphasis in original). In other words, "whenever an insanity defense is sought to be raised by the proffer of evidence of a newly-identified mental 'disease or defect,' the proffered evidence is relevant for the purpose only if there is shown to be substantial acceptance ... of the general hypothesis that this disorder may deprive *some* persons of the substantial capacity either to appreciate the wrongfulness of the particular conduct in issue or to conform their conduct to the particular requirements of law in issue." Id. at 49–50 (emphasis in original). "Only if that test of evidentiary relevance is met need the inquiry proceed to the further question of the sufficiency of the particular evidence to meet the defendant's burden of producing sufficient evidence of his own 'insanity' or lack of responsibility under the ALI test." *Id.* at 49.

In *Gould* we applied these principles to the expert testimony presented and to the documentary evidence relied on by the defendants, particularly the Diagnostic and Statistical Manual of Mental Disorders, Third Edition (DSM–III).[7] We determined that the initial test of foundational relevance was not met: there was insufficient proof to conclude that there is substantial acceptance in the medical community of the hypothesis that pathological gambling may cause some persons to be unable to resist attempting to rob banks. *Gould,* 741 F.2d at 51.

In the subject case, only one element of this formula has changed: instead of bank robbery, Gillis is charged with interstate transportation and sale of a motor vehicle, and interstate transportation of forged securities. Thus, we are faced with determining whether, in this context, Gillis' crimes can be meaningfully distinguished from that in *Gould.* We conclude that they cannot.

Much of the evidence in the subject case is the same as that in *Gould.* The DSM–III has been introduced to support the appellant's position, and one expert, Dr. Moravec, presented much the same testimony at both trials. In *Gould,* though, the nature of the crime—bank robbery—was clearly not the type generally thought to be related to pathological gambling disorder. DSM–III describes the disorder as characterized by "... loss of work due to absences in order to gamble, defaulting on debts and other financial responsibilities, disrupted family relationships, borrowing money from illegal sources, forgery, fraud, embezzlement, and income tax evasions.... Any criminal behavior—e.g., forgery, embezzlement, or fraud—is typically nonviolent."[8] In *Gould,* neither the DSM–III nor the expert testimony could show any accepted causal link between pathological gambling and attempted bank robbery, an inherently violent crime.

7. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (3rd Ed.1980).

8. *Id.* at 51.

According to the DSM–III, Gillis' crimes are of the type more typically associated with pathological gambling. His were non-violent crimes stemming from fraud, misrepresentation, and forgery. Even so, we are not persuaded that the causal link has been sufficiently shown to make evidence of pathological gambling legally relevant.

In *Lewellyn* the defendant was charged with embezzlement and fraud. The court concluded that "[t]he language of DSM–III does not establish that pathological gamblers may lack substantial capacity to refrain from engaging in embezzlement and similar criminal conduct." 723 F.2d at 618. The court then considered the expert testimony, including that of this same Dr. Custer. Dr. Custer's testimony tended to show the necessary cause-and-effect relation between the disease and the crimes. The court concluded, however, that the expert testimony failed to show that there was "general acceptance in the fields of psychiatry and psychology of the principle that some pathological gamblers lack substantial capacity to conform their conduct to the requirements of laws prohibiting embezzlement·and similar offenses." *Id.* at 619. Therefore, the evidence was inadmissible.

Likewise, in *Torniero*, the defendant was charged with interstate transportation of embezzled jewelry, a non-violent crime of the sort often associated with the pathological gambler. But the court stated that "we do not believe that an hypothesis subscribed to by only a small number of professionals establishes that a proposed defense can carry the day on relevance." 735

F.2d at 731.[9] The court concluded, therefore, that compulsive gambling, "even if a mental disease or defect, is not, *ipso facto* relevant to the issue whether the defendant was unable to restrain himself from non-gambling offenses such as transporting stolen property." *Id.* at 732. Because the causal link between the disease and the conduct was not sufficiently shown to have substantial acceptance in the profession, the testimony about pathological gambling was properly excluded from the jury. *Id.*

We have examined the record and found nothing to lead us to conclude that there is substantial acceptance in the relevant discipline that compulsive gambling disorder causes some persons to be unable to resist buying cars with bad checks and then transporting the cars and the paper over state lines. Although the DSM–III associates certain types of crime with the compulsive gambler, this does not create, nor was it intended to create, the legally sufficient causal link necessary for foundational relevance. *See Lewellyn* at 618 (although criminal conduct associated with disorder, it is not because the disorder causes the criminal to lack substantial capacity to conform conduct).[10] The expert testimony of Drs. Custer and Moravec, moreover, does not establish this causal connection any more satisfactorily than in *Gould, Lewellyn,* or *Torniero*.[11] Therefore, we conclude that the evidence of pathological gambling disorder did not meet the test of foundational relevance established in *Gould,* and that the jury was properly instructed by the trial court.[12]

9. We note that in *Torniero,* the ubiquitous Dr. Custer testified that "pathological gambling was not even considered a serious disorder" within the profession. 735 F.2d at 731.

10. The purpose of DSM–III is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat various mental disorders. The use of this manual for nonclinical purposes, such as determination of legal responsibility, competency or insanity ... must be critically examined in each instance within the appropriate institutional context.

DSM–III at 12. In fact, caffeine addiction, kleptomania, and alcoholism, none of which can generally provide the basis for an insanity defense, are listed in the DSM–III.

11. Dr. Custer conceded that only as recently as 1980 was pathological gambling recognized as a mental disorder and included in the DSM–III. (JA at 92). Dr. Moravec stated that the literature in this field is still very sparse. (JA at 152).

12. The trial court in the subject case admitted the testimony in order to make the crucial relevancy determination, but then instructed the jury that pathological gambling was not, of it-

Appellant's final claim of error is this court's refusal to allow him to proceed *pro se* during this appeal. On December 3, 1984, the Clerk of this Court entered an order at the direction of Judge Wilkinson,[13] denying appellant's *pro se* motion. The order provided, however, that appellant be permitted to file a supplemental brief raising any issues not addressed by court-appointed counsel.

Appellant bases his argument on the right, implicit in the Sixth Amendment, to "make one's own defense personally." *Faretta v. California,* 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). He also cites 28 U.S.C. § 1654, which states: "in all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

 The Sixth Amendment guarantees a right to be represented by counsel, and an indigent defendant, such as Gillis, has the absolute right to appointed counsel. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *United States v. Johnson,* 659 F.2d 415 (4th Cir.1981). Implicit in the Sixth Amendment is the right of a criminal defendant to present his own defense. *Faretta, supra.* Of the two, the right to be represented by counsel is preeminent, *United States v. Weisz,* 718 F.2d 413 (D.C.Cir.) *cert. denied* — U.S. ——, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1983), and because the right to self-representation necessarily involves the waiver of the right to counsel, self-representation can only be invoked by waiving counsel expressly,

knowingly, and intelligently. *Faretta, supra; United States v. Chatman,* 584 F.2d 1358 (4th Cir.1978). Contrasted with the right to counsel, the right to self-representation can be waived by failure timely to assert it, *Weisz, supra,*[14] or by subsequent conduct giving the appearance of uncertainty. *Brown v. Wainwright,* 665 F.2d 607 (5th Cir.1982).

 In constitutional analysis, however, the rights to counsel and self-representation *on appeal* stand on different ground. Unlike the right to trial, which is also guaranteed by the Sixth Amendment, there is no constitutional right to an appeal. *United States v. MacCollom,* 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976). Rather, where the right to appeal a criminal conviction exists, it exists only by statute. *Heike v. United States,* 217 U.S. 423, 30 S.Ct. 539, 54 L.Ed. 821 (1910). Once the right to appeal is granted, however, the Equal Protection and Due Process Clauses command that an indigent defendant has a right to appointed counsel, *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and access to the courts. *See Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956) (although appeal not constitutionally mandated, once allowed, Due Process and Equal Protection Clauses protect against invidious discrimination); *Nelson v. Peyton,* 415 F.2d 1154 (4th Cir.1969) *cert. denied sub nom. Cox v. Nelson,* 397 U.S. 1007, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970) (states not required to grant appeal, but once right granted, must give equal access and unqualified right to counsel); 18 U.S.C. § 3006A(c) (right to appointed counsel in criminal appeal).

---

self, sufficient to prove insanity under the ALI test. While the court could properly have instructed the jury to disregard testimony of pathological gambling as in *Gould,* the trial court felt that certain other symptoms described at trial might, compounded with the gambling disorder, lead the jury to conclude that there was a "disease or defect" sufficient to exculpate the defendant. This exercise of discretion was favorable to the defendant, and was not error.

As in *Gould,* we do not decide today whether pathological gambling is a "disease or defect," nor do we foreclose the possibility that, in rela-

tion to certain conduct, it might constitute an effective insanity defense.

**13.** Fed.R.App.P. 27(c) authorizes a single judge to decide motions.

**14.** If the right is not asserted before trial, it becomes discretionary with the trial court whether to allow the defendant to proceed *pro se. United States v. Dunlap,* 577 F.2d 867 (4th Cir.) *cert. denied* 439 U.S. 858, 99 S.Ct. 174, 58 L.Ed.2d 166 (1978).

■ Although a convicted defendant has a right to counsel on appeal, his implicit Sixth Amendment right to represent himself at trial does not carry over to the appeal. In *Price v. Johnston*, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), a *habeas corpus* case, the Supreme Court stated that a "prisoner has no absolute right to argue his own appeal or even to be present in the appellate court," *id.* at 285, 68 S.Ct. at 1060 (*citing Schwab v. Berggren,* 143 U.S. 442, 12 S.Ct. 525, 36 L.Ed. 218 (1892)), in sharp contrast to his right to be present at and conduct his own defense at trial. *Id.* This language was quoted with approval in *Faretta,* 422 U.S. at 816, 95 S.Ct. at 2531, undermining any argument that *Faretta* restricted *Price. See Chamberlain v. Erickson,* 744 F.2d 628 (8th Cir.) *cert. denied* — U.S. ——, 105 S.Ct. 1368, 84 L.Ed.2d 387 (1984).

■ Lacking a constitutional ground to appear *pro se* on appeal, then, appellant's only basis for that claimed right is 28 U.S.C. § 1654. This statutory right, however, is expressly subjected to "the rules of such courts." Local Rule 46.5 provides:

An individual may proceed without the aid of counsel, but should so inform the Court at the earliest possible time. In any pro se appeal, the Clerk shall notify the parties that they shall file informal briefs as provided by Local Rule 34(b). The Court will independently review the record for meritorious claims and will also consider the need for the appointment of counsel when reviewing the appeal under Local Rule 34(a). Cases involving pro se litigants are ordinarily not scheduled for oral argument.

Because of the complex legal issues involved in Gillis' appeal, it was determined that assistance of counsel and oral argument would be beneficial. Since, as discussed above, appellant has a constitutional right to effective assistance of counsel on appeal, but merely a limited statutory right to proceed *pro se*, the procedure adopted by the court strikes an appropriate balance of these potentially conflicting interests: counsel was appointed to brief the case and present oral argument, while appellant was allowed to submit a supplemental brief. *See Hines v. Enomoto,* 658 F.2d 667 (9th Cir.1981) (appointed counsel not improperly forced upon appellant in state appellate proceedings where appellant allowed to file a supplemental brief); *Cf. McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 *reh'g denied* — U.S. ——, 104 S.Ct. 1620, 80 L.Ed.2d 148 (1984) (*Faretta* right not infringed by appointment of standby counsel at trial where defendant allowed freely to address court, to make strategy decisions and to maintain appearance of autonomy before jury).[15]

Appointed counsel thoroughly briefed and ably argued the pertinent issues. *See Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1966) (counsel must act as advocate and not as *amicus curiae); Cf. Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (appointed counsel need not appeal every non-frivolous issue requested by the defendant). Appellant, by being allowed to submit his supplemental brief, was fully afforded any "right" he has to self-representation on appeal. The denial of his motion to proceed *pro se* was not error.

For the foregoing reasons, we

AFFIRM.

---

**15.** But see *Lee v. Alabama,* 406 F.2d 466 (5th Cir.) *cert. denied* 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246, *reh'g denied* 396 U.S. 871, 90 S.Ct. 44, 24 L.Ed.2d 129 (1969), where the court stated that based on 28 U.S.C. § 1654, "neither the district court nor this court has the power to force [a competent defendant] to accept representation by counsel." *Id.* at 466. This was in the context, however, of a petitioner for *habeas corpus* who, after being allowed to proceed *pro se* at trial, and then on appeal by submitting briefs, claimed that he had been denied effective assistance of counsel. By appointing counsel and allowing appellant to file a brief, we have avoided this problem.