UNITED STATES of America, Appellee,

v.

Michael Robert BROWN, Appellant.

No. 85–5536.

United States Court of Appeals,
Fourth Circuit.

Argued March 7, 1986.

Decided June 12, 1986.

Mark A. Michael (Badger, Johnson, Chapman & Michael, Charlotte, N.C., on brief), for appellant.

Kenneth P. Andresen, Chief Asst. U.S. Atty., Charlotte, N.C. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before WIDENER and HALL, Circuit Judges, and MICHAEL, District Judge for the Western District of Virginia, sitting by designation.

WIDENER, Circuit Judge:

Appellant, Michael Robert Brown, was tried and convicted in the United States District Court for the Western District of North Carolina on two counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2(b), one count of telephone fraud in violation of 18 U.S.C. § 1343, and two counts of interstate transportation of stolen goods in violation of 18 U.S.C. §§ 2314 and 2(b). Brown was sentenced to one 10-year prison term, one 5-year prison term to run concurrently, and a 2-year prison term to run consecutively with the 10-year term. Brown's sole issue raised on appeal challenges the district court's refusal to instruct the jury on the defense of insanity. We agree that under the facts of this case the requested jury instruction should have been given. We vacate Brown's conviction and remand for a new trial.

Because the facts surrounding the crimes are not in dispute, we will discuss them only briefly. On August 23, 1984, Brown telephoned George Bruce, a gem wholesaler in Georgia, and, falsely representing himself to be a buyer for a reputable jeweler, ordered 104 gemstones, valued at $410,000 wholesale. The stones were mailed to Brown pursuant to his telephone orders.

On December 13, 1984, Brown was apprehended in Miami, Florida. Eighty-six of the stones were found in Brown's hotel room in Miami. Additional stones were found in various pawn shops in Florida.

Pursuant to Fed.R.Crim.Proc. 12.2(a), Brown filed a notice of intent to rely upon the defense of insanity. Brown was then examined by Dr. William Warren, a court appointed psychologist, who reported to the court and counsel that "Mr. Brown's excessive religiosity, lack of demonstration of appreciation of the consequences of the legal proceedings, unrealistic faith that God will help him with the legal proceedings and that he need not involve himself with the details of the criminal proceedings, and reported change in the behavior over the past two years suggest the need for further evaluation regarding his sanity and competency to stand trial. He demonstrates no real appreciation of the charges against him or of the length of the possible imprisonment. His degree of religiosity as demonstrated in these interviews suggests the possibility of a delusional system which significantly affects his judgment."

Thereafter, Brown was admitted to the Medical Center for Federal Prisoners in Springfield, Missouri for further evaluation. Following evaluation, Dr. Clayton Pettipiece, a forensic psychiatrist, reported that Brown did "not present any clinical evidence of any major mental illness. At this time manic depressive illness is a possibility but we have neither a family history nor evidence that he is presently manic nor has been manic in the past." Dr. Pettipiece diagnosed no mental illness or personality disorder. Dr. Richard J. D'Andrea, a staff psychologist at the Medical Center, also prepared an evaluation report, agreeing with the diagnosis of no mental disease.

At trial, Brown testified that he did not wish to base his defense on insanity, that he understood the proceedings against him, that he had no history of mental disease and that he was completely sane.[1]

Tom Brown, the appellant's brother, testified that his brother's mental state changed after 1983, after Michael became acquainted with Sister Bessie Whitehead. Prior to 1983, Michael had a good work record, had never been in any legal trouble, and had been very close to his family. After 1983, however, he became more and more isolated from his family. He quit his job and stopped paying his bills. He told his brother of a vision he and Bessie had that his brother would save their house from foreclosure.[2] Brown's condition continued to deteriorate so that when Tom Brown went to see his brother after he was arrested, he recounted that:

> I eventually got to see Mike, and I just couldn't believe the mental state he was in. It didn't affect him at all that this was a federal offense, and he had told me that everything was going to work out fine, something about how it happened or however, that he wasn't really involved or what have you, and then he mentioned to me about Sister Bessie, that she was also in prison in another location, and in their ministry, that they had visions that she would be going to the White House and taking care of foreign affairs with the President and assisting him in worldly problems, and you know, I just sat and listened. The whole mental process just wasn't Mike at all, and he just did not attach any seriousness to the offense that he was in jail for.

At trial, Brown relied upon the testimony of Dr. Warren who conducted Brown's initial psychological evaluation. Dr. Warren testified that Brown had refused to take a psychological test for religious reasons, saying that the test was too worldly. Brown had also advised Dr. Warren that he had a religious conversion in the past and believed that God would assist him in this legal proceeding.[3] Dr. Warren testified that he had reviewed the final psychological evaluation of Brown and based on his own observation and that latter report he was unable to offer any clear psychological explanation for Brown's changed behavior. He doubted Brown's overall judgment.

Dr. D'Andrea testified regarding the psychological report prepared at the Medical Center for Federal Prisoners. He diagnosed Brown as having no mental disease or defect. Testing revealed that Brown was defensive and resistive to psychological evaluation and tended to minimize faults in himself and tended to deny unacceptable feelings and impulses. He lacked flexibility and showed a poor tolerance for stress. He also made excessive use of repression and denial. Dr. D'Andrea had no explanation for any changes in Brown's personality.

Following all of the evidence, the trial court refused to instruct the jury on Brown's insanity defense. Brown was subsequently convicted.

In *Hall v. United States*, 295 F.2d 26 (4th Cir.1961), this court reversed a kidnapping conviction because the trial court refused to instruct the jury on the question of Hall's sanity. The court recognized that such an instruction must be given once evidence has been presented calling the defendant's sanity into question. We held the presentation of even slight evidence is sufficient to raise the issue and require that the question be submitted to the jury.

---

**1.** Brown did not wish his attorney to raise the insanity defense issue in this appeal. The attorney nevertheless is pursuing the issue here. At this point, we should note the impossible position Brown's attorney is in by virtue of Brown's expressed wishes. We hasten to add that the conduct of the attorney is not subject to criticism.

**2.** Brown had previously deeded a part interest in his house to Sister Bessie.

**3.** In his report, Dr. Warren noted that he had found indications of "grandiosity, excessive religiosity, and impaired judgment" and a "lack of demonstration of appreciation of the consequences of the legal proceedings."

In so concluding in *Hall,* we relied upon *Tatum v. United States,* 190 F.2d 612 (D.C. Cir.1951), where the court of appeals sua sponte raised the issue of the defendant's sanity and awarded a new trial because the question was not put to the jury. The only evidence challenging Tatum's sanity was his claimed lapse of memory of the events of the crime and such testimony of lay witnesses as a deputy coroner that Tatum appeared to be in a trance and the statement of a police officer that Tatum's appearance was abnormal. *Tatum,* supra, at 616. On the other hand, both of the psychiatrists who testified agreed that Tatum was of sound mind. *Id.* The court concluded that the evidence presented was sufficient to raise the issue of insanity and failure to submit the issue to the jury was reversible error.

■ We reject the government's argument that *United States v. Gould,* 741 F.2d 45 (4th Cir.1984), in some way altered the *Hall* slight evidence test. As *Gould* itself points out, the defense of insanity is introduced into a criminal trial by the defendant's production of evidence, even if the quantum of such evidence is slight. Once such evidence is produced, the burden is upon the government to prove beyond a reasonable doubt that the defendant is legally responsible for his actions. *Gould,* supra, at 47 and 50. Both lay and expert testimony can be used to raise the issue of insanity. *United States v. Hartfield,* 513 F.2d 254, 260 (9th Cir.1975).

■ Upon the facts before us, we conclude that the slight evidence test of *Hall* was met in this case which should have required the district court to instruct the jury on the defense of insanity. The lay evidence of Brown's aberrational conduct and lack of appreciation of the seriousness of the criminal charges, together with Dr. Warren's testimony that Brown believed that God would assist him in his defense and that he doubted Brown's overall judgment, were the principal items before the jury making up the slight evidence necessary for it, rather than the court, to decide the question.

The judgment of the district court must be vacated and the case remanded for a new trial.

VACATED AND REMANDED.