780 F.2d 425
 19 Fed. R. Evid. Serv. 557
 UNITED STATES of America, Appellee,
v.
Anthony GRANDISON, Appellant.
UNITED STATES of America, Appellee,
v.
Vernon EVANS, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Janet Patricia MOORE, Appellant.
UNITED STATES of America, Appellee,
v.
Rodney KELLY, Appellant.
UNITED STATES of America, Appellee,
v.
Anthony GRANDISON, Appellant.
UNITED STATES of America, Appellee,
v.
Vernon EVANS, Jr., Appellant.
 Nos. 84-5007(L), 84-5008 to 84-5010, 84-6623 and 84-6624.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 9, 1985.
Decided Dec. 23, 1985.
 
 Fred Warren Bennett, Federal Public Defender, Lalit H. Gadhia, Baltimore, Md., Martha F. Rasin, Annapolis, Md. (Bereano & Resnick, Annapolis, Md., Thomas B. Mason, Asst. Federal Public Defender, and Rodney Kelly, pro se, on brief), for appellants.
 Juliet A. Eurich, Asst. U.S. Atty. (Catherine C. Blake, U.S. Atty., Baltimore, Md., Steven M. Sindler and Susan Stevens, Third Year Law Students, U.S. Atty's Office, on brief), for appellee.
 Before PHILLIPS, MURNAGHAN and WILKINSON, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Anthony Grandison, Vernon Evans, Jr., Janet Patricia Moore, and Rodney Kelly were indicted for conspiracy to violate civil rights, 18 U.S.C. Sec. 241, and witness tampering, 18 U.S.C. Sec. 1512. Those federal charges grew out of the brutal murder of two motel employees, one of whom, Scott Piechowicz, was in a position to identify Grandison as someone who visited the motel in early November 1982.[1] The testimony as to the whereabouts of Grandison was significant to establish Grandison's guilt in a federal narcotics case, initiated in November 1982, for which trial was pending on April 28, 1983, the date of the murders. The narcotics case was then scheduled to commence on May 3, 1983.
 
 
 2
 The testimony in the civil rights violation and witness tampering prosecution was ample to establish a) the conspiracy and b) the tampering with, indeed the total elimination of, Scott Piechowicz as a witness. All four defendants were convicted of both crimes charged.
 
 
 3
 Grandison, while he was in jail in January 1983, asked his girlfriend, Nancy Hopson, if she would remember the manager of the motel, Scott Piechowicz, if she saw him again. She was in a position to do so because on another occasion she had been charged with breaking and entering at the motel and Scott Piechowicz had testified against her. Hopson testified before the grand jury that Grandison asked her to take the co-defendant Kelly to the motel to point out Piechowicz to him.[2] She did so.[3] Thereafter, when Hopson visited Grandison in jail, Grandison used the word "dead" in connection with Scott Piechowicz when they discussed Hopson's and Kelly's trip to the motel. According to Hopson, Kelly told her that the drug prosecution should not worry Grandison because Scott Piechowicz "wouldn't be around" for the trial, but would be "injured, hurt or dead."
 
 
 4
 In March 1983, a suppression hearing in Grandison's narcotics case was held and the Piechowiczes appeared to testify. Before Cheryl Piechowicz testified at the hearing and identified Grandison as the person who had been at the motel on the critical date she was approached by Janet Patricia Moore, one of the co-defendants, who told her "If I were you I'd say I never saw him before in my life." Immediately after the suppression hearing, on March 14, 1983, Grandison, who theretofore had assessed the evidence against him as weak, wrote Moore "[The] white bitch testimony ain't shit" and that Hopson might, at his request, have to take a friend of his to see Kelly because he wanted the friend "to take care of something to be on the safe side." The "friend" to whom Grandison referred was the co-defendant, Vernon Evans, Jr.
 
 
 5
 On April 22, 1983 an order came down in the narcotics case denying the suppression sought by Grandison. Evidence at trial of the instant case established that Moore visited Grandison at the jail some time between April 22, 1983 and April 28, 1983, and and that on April 26, 1983, Grandison telephoned Evans, who, along with Moore, went to meet with Grandison at the jail. Later on April 26, Evans, Moore and Charlene Sparrow, Evans' girlfriend who was a star witness for the prosecution, picked up Kelly and the group repaired to an apartment where, in a telephone conversation with the jailed Grandison, the "protective glass" situation at the motel was mentioned.
 
 
 6
 Evans and Sparrow then drove to the motel where the Piechowiczes worked. On the way, Evans told Sparrow they were going to kill someone. However, due to lack of vacancies, Evans and Sparrow were unable to carry out their plan to register at the motel.
 
 
 7
 There was testimony from another witness, Calvin Harper, that, on the next day, April 27, 1983, Kelly showed him a machine gun equipped with a silencer and that they turned the gun over to Evans, telling him it was for the job. Sparrow and Evans returned to the motel and they spent the night of April 27th there.
 
 
 8
 On the 28th, Kelly arrived at the motel and picked up Evans. Kelly brought with him a MAC-11 machine gun with an attached silencer which he gave to Evans. Kelly left and Evans and Sparrow went to their own car. Sparrow remained in the car outside the motel, while Evans went into the motel. As he was leaving, according to Sparrow, Evans stated that "anyone was in his way, they was going too."
 
 
 9
 When Evans, in about fifteen to twenty minutes, ran to the car, Sparrow saw smoke coming out of a silencer attached to a weapon in Evans' possession. Sparrow and Evans drove into the city, where Kelly picked up the car and the canvas bag containing a heavy metal object.
 
 
 10
 At the trial, positive identification was introduced which located both the gun and Evans at the scene of the crime at about 3:00 p.m. on April 28, 1983. Scott Piechowicz and Susan Kennedy were shot with a MAC-11 machine gun at 3:22 in the afternoon.
 
 
 11
 After that recital, which does not include all the evidence against the four defendants, we find it amply proven beyond a reasonable doubt that Grandison, Evans, Moore and Kelly conspired to violate the civil rights of Scott Piechowicz and, in the course of effectuating the purposes of the conspiracy, tampered with Scott Piechowicz as a witness.
 
 
 12
 Following return of verdicts of guilty, the all-too customary panoply of asserted errors was advanced.
 
 Admission of Photographs of Victims
 
 13
 The photographs of which the defendants complain showed Susan Kennedy with her fiance and a beach scene of Scott Piechowicz, Cheryl Piechowicz and their child. Testimony extolling the virtues of Scott Piechowicz was also admitted. Objections were lodged on grounds of non-relevance under Federal Rule of Evidence 402 and inadmissibility under FRE 403, because the probative value of the photographs and testimony, even if relevant, was outweighed by the danger of unfair prejudice. As for the relevance contention, we perceive no strength in the argument because Susan Kennedy and Scott Piechowicz were central figures in the crimes that had been charged. They had to be identified.
 
 
 14
 Even if we assume, without deciding, that the district judge abused his wide discretion under FRE 403, because the probative value of the photographs was "substantially outweighed by the danger of unfair prejudice," at most the error was harmless.[4] Pretty pictures of enticing domestic scenes and endearing remarks about one of the decedents were not likely to influence a jury's determination in the case before us. Indeed, if there was error, beyond any doubt it was harmless. See Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946); cf. Fed.R.Crim.P. 52(a). See also United States v. Davis, 657 F.2d 637, 640 (4th Cir.1981); United States v. Tibbetts, 565 F.2d 867, 868 (4th Cir.1977).
 
 
 15
 Restrictions on Grandison's Movements While He Represented Himself at Trial
 
 
 16
 Grandison availed himself of his constitutional right to represent himself at trial. See Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Stand-by counsel was also made available. During the trial from October 5, 1983 to November 3, 1983, Grandison was required to remain seated at the counsel table, and was not permitted to approach the witnesses. Grandison had already been convicted on May 11, 1983 and sentenced on June 13, 1983 in the narcotics case from which the case here on appeal was an outgrowth. The district judge reasoned that the differentiation between Grandison and counsel for the other defendants was significant enough to require that he remain seated and not approach the jury or witnesses, save when making an opening statement and a closing argument.
 
 
 17
 We find no abuse of discretion in the solicitude for the jury and witnesses which lay behind the judge's ruling. As he pointed out, the requirement that Grandison not approach others in the courtroom was a consequence of his election to represent himself. While Grandison certainly had the right to do that, the exercise of that prerogative should not confer relief from a collateral and incidental disadvantage of his status as a convicted felon. He properly was not permitted to approach within striking distance of witnesses when, as a defendant, he would have no such right, especially bearing in mind that he stood convicted of a crime which provided the district judge with a justifiable basis for concern for the witnesses' psychological, and perhaps physical, well-being.
 
 
 18
 Balancing conflicts is the recurring job of a district judge. We simply do not regard as valid the assertion that requiring Grandison to remain in his seat at counsel table dissipated his presumption of innocence. Nor do we perceive any justifiable basis for the contention that the failure to sever their trials from that of Grandison created an appearance of guilt by association insofar as Evans, Moore and Kelly were concerned. In matters of restraint of defendants, the trial judge is afforded considerable latitude in his decisions. See Billups v. Garrison, 718 F.2d 665 (4th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 91, 83 L.Ed.2d 37 (1984); United States v. Samuel, 431 F.2d 610, 615 (4th Cir.1970), later appeal, 433 F.2d 663 (4th Cir.1970), cert. denied, 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971); Brewster v. Bordenkircher, 767 F.2d 81 (4th Cir.1985) (en banc ). The same is true respecting a request for severance, the denial of which will not be disturbed on appeal in the absence of "a clear abuse of ... discretion." United States v. Becker, 585 F.2d 703, 706 (4th Cir.1978), cert. denied, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979).
 
 
 19
 The Government's Use of Peremptory Challenges
 
 
 20
 Six of the Government's peremptory strikes were employed against blacks who were members of the venire. However, the jury as finally selected included two blacks. Three alternate jurors also were seated who were black. We are aware, of course, that Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), holding that a systematic discrimination must be shown and not simply discrimination in the particular case, may be reassessed since the Supreme Court has granted certiorari in Batson v. Kentucky, cert. granted, --- U.S. ----, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985). See also McCray v. Abrams, 750 F.2d 1113 (2d Cir.1984); United States v. Leslie, 759 F.2d 366 (5th Cir.1985), reh'g en banc granted, 761 F.2d 195 (1985); Roman v. Abrams, 608 F.Supp. 629 (S.D.N.Y.1985); but cf. Prejean v. Blackburn, 743 F.2d 1091, 1103-1104 (5th Cir.1984); Schreiber v. Salamack, 619 F.Supp. 1433 (S.D.N.Y.1985).
 
 
 21
 Cases involving total elimination of a minority group are different, indeed, from ones where, as here, two of eight, or 25%, of the blacks who might have been stricken were left by the prosecution on the jury. The Government had nine peremptory strikes. We simply do not accept that the possible modification of Swain v. Alabama's holding presages a change so extensive as the one proposed by the appellants here.
 
 Admission of Hopson's Grand Jury Testimony
 
 22
 Had the Government displayed a tendency amounting to a scheme to secure admission at the trial of grand jury testimony for substantive purposes, when it properly was admissible merely for impeachment purposes, or had it sought to introduce grand jury testimony because the Government preferred it to noncontradictory but less impressive testimony of the witness, we might be presented with a troublesome question. See United States v. Miller, 664 F.2d 94, 97 (5th Cir.1981), cert. denied, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). However, here we are confronted with a situation in which substantive testimony very damaging to the defendants had been given by Hopson to the grand jury on May 13, 1983, but, in mid-September, a few weeks before trial, she recanted and through her attorney informed the prosecutor and the FBI that she had changed her testimony. On her production at the trial, the prosecutor represented that he did not know what Hopson was going to do. She took the Fifth Amendment and recanted her grand jury testimony, and the prosecutor represented to the court at side bar that Hopson had been threatened and was afraid she would be charged criminally. The prosecutor insisted that he was calling Hopson in good faith.
 
 
 23
 The Government was permitted to proceed by reading the damaging grand jury testimony to Hopson who, in turn, fully performed her role as a recalcitrant witness by denying the accuracy of all the inconsistent statements. Rule 801(d)(1)[5] of the Federal Rules of Evidence refutes the claim that the procedure followed was improper. Hopson's statements were not hearsay because her grand jury statements were given under oath subject to the penalty of perjury. See 4 Weinstein and Berger, Weinstein's Evidence (1985 ed.) p 801(d)(1) at 801-101. Under Rule 801(d)(1)(A), the testimony was properly given substantive effect and was not restricted to use for impeachment purposes, as it would be otherwise. Id. p 607 at 607-72--607-73. With respect to what may constitute substantive evidence, Weinstein states: "Testimony given before a grand jury is clearly included." Id. at 801-104.
 
 
 24
 The correctness of the district court's ruling that the grand jury testimony of Hopson could be introduced for substantive purposes is tellingly established by the words of Judge Haynsworth in United States v. Murphy, 696 F.2d 282, 284 (4th Cir.1982), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1303 (1983), with respect to FRE 801(d)(1). Judge Haynsworth observed that the rule "will provide a party with desirable protection against the 'turncoat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case."
 
 
 25
 Admissibility of Grandison's March 14, 1983 Letter to Moore
 
 
 26
 Objection to the admissibility of Grandison's epistle of March 14, 1983 has been expressed by the defendants other than Grandison on hearsay grounds. The Grandison letter, however, provides persuasive evidence of a conspiracy in which Evans, Kelly and Moore were engaged with Grandison in a common scheme. The letter, written shortly after the suppression hearing at which Cheryl Piechowicz gave testimony damaging in the extreme to Grandison, speaks of having Kelly or another "take care of something to be on the safe side." Evans, Kelly and Moore question the admissibility of the testimony under the co-conspirator's exception to the hearsay rule. FRE 801(d)(2)(E). However, Grandison's statement provided pertinent proof of the actions and knowing participation of the conspirators. United States v. Jones, 542 F.2d 186, 203 (4th Cir.1976), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976). Membership of the four in the conspiracy had been adequately demonstrated, to the satisfaction of the district judge, by the record of testimony and exhibits as a whole. See, e.g., United States v. Hines, 717 F.2d 1481, 1488 (4th Cir.1983), cert. denied, Jackson v. United States, --- U.S. ----, 104 S.Ct. 2656, 2668, 81 L.Ed.2d 363 (1984). The objections as to the letter's sufficiency went at most to the weight and not to the admissibility of the testimony.
 
 
 27
 Moore's Standing to Challenge the Search of Gwendolyn Farmer's Car
 
 
 28
 Moore attacks admission of the March 14, 1983 Grandison letter on an additional ground. The letter, contained in an open envelope, wrapped in an unsealed plastic bag, and seized by law enforcement authorities without a warrant, was locked in the car of her friend Gwendolyn Farmer. However, Moore, through forgetfulness, by mistake left the letter in Farmer's car. She thereby abandoned any legitimate expectation of privacy. See Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); United States v. Ramapuram, 632 F.2d 1149, 1153-54 (4th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).
 
 
 29
 Furthermore, it appears that Moore had no sufficient standing to raise the question. The car was Gwendolyn Farmer's, not hers and, consequently, she had no possessory interest and no basis for relying on the conclusion that any subjective expectation of privacy she may have had was reasonable. Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).
 
 
 30
 Admissibility of Kelly's Statements to Hopson
 
 
 31
 Statements damaging to Kelly concerning Hopson's January 1983 trip with Kelly to the motel to identify Piechowicz came in as part of Hopson's grand jury testimony, and were deemed admissible under the co-conspirator's exception to the hearsay rule as being made in furtherance of the conspiracy. FRE 801(d)(2)(E) defines as an admission "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Evidence is admissible for demonstrating knowing assistance of any kind in effectuating the object of the criminal activity. United States v. Jones, supra.
 
 
 32
 Even if the statements were uttered in the nascent stages of the conspiracy, we do not find that a basis for upsetting the trial court's reasonable determination that the remarks were made "in furtherance of the conspiracy." See, e.g., United States v. Bentley, 706 F.2d 1498, 1506 (8th Cir.1983), cert. denied, 464 U.S. 830, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983) and --- U.S. ----, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984).
 
 
 33
 Court's Refusal to Strike a Juror for Cause
 
 
 34
 The complaint here concerns the juror who had expressed doubts as to whether she could remain uninfluenced by the indictment. She stated "... there is a lot of evidence ... and so I don't [know] if I would be particularly fair or if that is bias or what ... the indictment ... just sticks out in my mind." The juror, following instructions by the court that she should not be influenced by the indictment, said she would try to follow the court's instructions even if she did not agree with the law as instructed. She further stated that, based on the court's instructions she had no prejudice, bias or idea which would prevent an impartial verdict.
 
 
 35
 Those expressions by the juror provided an adequate basis for a conclusion by the district judge that she could "lay aside [her] impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). The district court refused to strike the juror for cause, and a peremptory challenge was employed against her. The appellants are not able here to demonstrate manifest prejudice on the part of the prospective juror, and, consequently, the trial court may not be faulted for refusing to strike for cause. The trial judge's discretion in such matters is very broad and his decision will not be overturned except for manifest abuse of discretion. United States v. Jones, 608 F.2d 1004, 1007 (4th Cir.1979), cert. denied, 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 773 (1980). See also United States v. Smith, 748 F.2d 1091, 1093-94 (6th Cir.1984).
 
 Influence of the Grand Jury by Publicity
 
 36
 Appellants claim that the grand jury was influenced by the publicity concerning Grandison and the murders of Scott Piechowicz and Susan Kennedy and so could not be objective. That, they contend, created a situation in which they should have been allowed to question the grand jurors to determine their degree of bias. There is, however, a strong presumption of regularity accorded to the deliberations and findings of grand jurors. Thus, even where inadequate neutralization of publicity accessible to the petit jury led to reversal of a conviction, it did not justify the voiding of the indictment handed down by the grand jury and a new trial was deemed permissible. Silverthorne v. United States, 400 F.2d 627, 633-34 (9th Cir.1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971) (allowing a defendant to peruse grand jury minutes, or to question jurors would not provide any "objective assessment of the existence of prejudice"). See also United States v. Mandel, 415 F.Supp. 1033, 1063 (D.Md.1976), vacated on other grounds, 591 F.2d 1347 (4th Cir.1979), conviction affirmed en banc, 602 F.2d 653 (4th Cir.1979), further rehearing en banc denied, 609 F.2d 1076 (1979), motion for writ of mandamus denied, 445 U.S. 959, 100 S.Ct. 1667, 64 L.Ed.2d 250 (1980), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).
 
 
 37
 As the district court pertinently observed in denying a motion to dismiss for grand jury prejudice
 
 
 38
 As a practical matter, it is impossible to formulate any system whereby a grand jury can be cantonized, as it were. The grand jury lives in the world and reads the newspapers, listens to the radio, and television. It is almost impossible for any grand jury to be called and a case presented to them that is of any public interest whatsoever that the grand jury wouldn't have heard about. Under our system, the major protection afforded a Defendant who is, in fact, indicted, is the voir dire of the petit jury panel to make sure that as far as humanly possible [there] is an impartial trial jury to hear the case.
 
 Expert Testimony on Evans' Line-up
 
 39
 Evans sought to introduce testimony from a sergeant on the Baltimore City police force in order to establish that there was a flaw of a suggestive nature in the line-up employed at the pretrial stage. However, "[t]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence and his action is to be sustained unless manifestly erroneous." Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); United States v. Portsmouth Paving Corp., 694 F.2d 312, 323-24 (4th Cir.1982). The prospective witness was not present at the line-up, nor had he worked for Baltimore City in a "hands on" situation for fifteen years. The testimony he would have given concerned line-up practice from no later than 1967. The district court was well within the scope of its discretion, especially bearing in mind that Evans' rights to confrontation and, consequently, to a fair trial were preserved by his cross-examination of identification witnesses.
 
 
 40
 In a case like the present one where the defense puts forth a potpourri of contentions, one goes through them in decreasing order of persuasiveness, until one reaches a point of no return where each remaining contention proves insufficient to merit reversal. We have reached that point here and will not discuss the remaining contentions in any detail:
 
 
 41
 1. Grandison and Evans maintain that, as state prisoners removed from federal custody, lent to permit the State of Maryland to prosecute them for the murders of Scott Piechowicz and Susan Kennedy, they are now outside the jurisdiction of the federal courts. See, however, Crawford v. Jackson, 589 F.2d 693 (D.C.Cir.1978), cert. denied, 441 U.S. 934, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979). Though "on loan" to Maryland, Grandison and Evans remained federal prisoners.
 
 
 42
 2. Kelly has complained about remarks appearing in the opening statement of the prosecution which he asserts constituted criticism of the defendants as perpetrating "an attack against the system." Such remarks did not come close to poisoning the minds of the jury and, while the prosecutor may have struck hard blows, he did not strike foul ones. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Furthermore, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, --- U.S. ----, ----, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).
 
 
 43
 3. A complaint has been directed by Kelly at the failure of the government to accept and be bound by the results of a polygraph test administered to Hopson suggesting that she was truthful in her recantation testimony. The reasons against admission of polygraph tests in evidence equally apply here and rebut that contention. United States v. Brevard, 739 F.2d 180, 182 (4th Cir.1984). Cf. United States v. Marshall, 526 F.2d 1349, 1360 (9th Cir.1976), cert. denied, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976).
 
 
 44
 4. Admission of a replica of the machine gun employed in the killings has been asserted to constitute an impropriety. See, United States v. Cunningham, 423 F.2d 1269, 1276 (4th Cir.1970) where we stated "[t]he lack of positive testimony to identify the gun as the gun used in the robbery does not preclude its admissibility. There was ample testimony of the fact that a weapon was used in the commission of the crime and there was ample evidence of the similarity between the gun admitted and the gun which was used."
 
 
 45
 5. Kelly has expressed objection to the curtailing of testimony arguably tending to establish that there had on other occasions been robberies at the motel which might have been connected to the murders and that, therefore, there were others possessed of a motive to kill the Piechowiczes. The theory was so farfetched in light of the other direct testimony that there was no abuse of discretion in not permitting it and in not allowing issuance of subpoenas for those who allegedly would provide such testimony. Cf. United States v. Becker, 444 F.2d 510, 511 (4th Cir.1971).
 
 
 46
 6. Grandison maintains that Sparrow's testimony concerning her conversations with Evans and other conspirators, implicating Grandison, was not admissible under FRE 801(d)(2)(E), because Sparrow was not an indicted co-conspirator. Sparrow, however, was a witness giving testimony under oath and present to be cross-examined. Under the co-conspirator's admission rule, there must be some evidence of the conspiracy and the participation of the declarant and defendant in that conspiracy. The attack is misdirected at the person quoting the declarant, who, in each case, was a co-conspirator. There is no reason to establish that the witness was also a conspirator. United States v. Kelly, 718 F.2d 661, 663 (4th Cir.1983).
 
 
 47
 7. Grandison also maintains that the hearsay exception for co-conspirator statements should not have permitted admission of evidence after the date of the termination of the conspiracy with the murders of the motel employees on April 28, 1983. While some evidence after that date may have been admitted, such evidence was minimal in comparison to the overwhelming evidence concerning the conspiracy before April 28, 1983. That evidence clearly established the events which led to the murders. If there was error in admitting post-April 28, 1983 evidence,[6] such error was harmless and did not affect the jury's verdict, given the amount and substance of the other evidence. United States v. Fischetti, 450 F.2d 34, 41 (4th Cir.1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1972); Kotteakos v. United States, supra.
 
 
 48
 Other contentions are raised, under such rubrics as lack of fairness of the trial to Kelly, insufficiency of the evidence to support Grandison's conviction, the prosecution's alleged knowing presentation of Hopson's perjured testimony before the grand jury, and allowance of mention of Susan Kennedy in the course of the trial, but, to the extent they are asserted, they stand fully rebutted by a review of the record. They genuinely do not warrant, even in a case of the enormous consequences of this one to the defendants, more detailed attention from the court.
 
 The judgments of the district court are
 
 49
 AFFIRMED.
 
 
 
 [1]
 The other employee, Susan Kennedy, who was murdered was the sister-in-law of Scott Piechowicz. She, the unhappy bystander, was substituting for her sister, Cheryl Piechowicz who also was in a position to locate Grandison at the motel at a crucial time
 
 
 [2]
 At trial, Hopson turned out to be a recanting witness. She had given testimony before the grand jury which constituted evidence, among other things, of Kelly's viewing of Piechowicz. At trial the grand jury testimony was admitted in evidence, which creates one of the issues raised in the appeal. The admission of the grand jury testimony of Hopson was not error, as later will be shown
 
 
 [3]
 While Hopson in her recantation mode denied having done so, her contrary testimony before the grand jury sufficed to permit the jury to conclude that she, indeed, had gone with Kelly to the motel. See Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)
 
 
 [4]
 That there was such an abuse of discretion is dubious indeed. Cf. United States v. Whitfield, 715 F.2d 145, 147 (4th Cir.1983) ("In the absence of a clear showing of abuse of discretion, the trial court's decision to admit or reject photographs into evidence should not be disturbed.")
 
 
 [5]
 Statements which are not hearsay. A statement is not hearsay if--
 (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding....
 
 
 [6]
 We do not pause to consider whether inquiries by those who were conspirators until the fatal shots were fired as to whether the crimes had been successfully achieved, and arrangements to effect a pay-off for completion of the foul deed were, or were not, part of the conspiracy, even though the murders had already occurred