**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**A & S COUNCIL OIL COMPANY;
Artice L. Council, Defendants–
Appellants.**

**No. 90–5239.**

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1991.

Decided Oct. 18, 1991.

H. Gerald Beaver, argued, Beaver, Holt, Richardson, Sternlicht, Burge & Glazier, P.A., Fayetteville, N.C., for defendants-appellants.

Thomas Wayne Dworschak, Sp. Asst. U.S. Atty., Raleigh, N.C., argued (Margaret Person Currin, U.S. Atty., on brief), for plaintiff-appellee.

Before HALL, Circuit Judge, STAKER, District Judge for the Southern District of West Virginia, sitting by designation, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

K.K. HALL, Circuit Judge:

Artice Council and his wholly-owned business, A & S Council Oil Company, appeal their convictions following a jury trial of conspiracy to defraud the government through false claims. We reverse and remand for a new trial.

### I.

#### A.

This case involves a conspiracy to divert heating oil intended for the military base at Fort Bragg, North Carolina, and to submit false bills to the United States for the undelivered fuel. There is no question that the diversions occurred; the only issue at the trial below was whether appellants were participants in the conspiracy. Appellants are Artice Council and his sole proprietorship, A & S Council Oil Company. Except where the context indicates otherwise,

we refer below to appellants collectively as "appellant" or "Council," inasmuch as only a single individual is actually involved.

### B.

The following summary of the government's evidence describes the fraudulent scheme. Sellers Oil Company ("Sellers") was awarded a contract to provide heating oil to Fort Bragg, and Council subcontracted to supply part of the fuel. The government's obsolete maps showed oil tanks that no longer existed; some Sellers and Council drivers quickly saw an opportunity to submit bills for supposed deliveries to erstwhile tanks while selling the undelivered oil off-base.

The genesis of the conspiracy was an April, 1986, conversation between Walter Ford, a driver for Sellers, and Eugene Jackson, Sellers' field manager. Ford pointed out the discrepancies between the government's map and reality, and suggested that prior contractors had probably made a fortune diverting oil. Jackson asked Ford if he thought they could get away with a similar scam; Ford responded that he thought they could.

In June, 1986, Jackson encountered Ford and Lawrence Hayes, another driver for Sellers. Ford was finished with his Fort Bragg run, but Hayes still had some fuel left. Jackson instructed Ford to pump Hayes' oil onto Ford's truck; Ford took the oil back to the Sellers Oil lot. Hayes checked out of Fort Bragg with an empty truck. Jackson paid Ford $150 and Hayes $50–$75 for this misdeed.

Similar diversions continued through December, 1986. The modus operandi varied. Ford twice faked a breakdown of his truck; when the truck was hauled off-base for repair, oil was removed. Delivery tickets were falsified regularly. Hayes sometimes used a Sellers truck that could pump air through its meter to create a false reading.

In six months, Ford was paid between six and twelve thousand dollars for his part. Over ninety-five thousand gallons of oil were diverted.

### C.

No one was indicted for three years. In February, 1990, Jackson "found Jesus" (he did so periodically), and he wrote a letter to Special Agent Hobbs of the FBI, which begins:

> I Eugene Jackson am giving you a written statement. I realize under the law that it could incriminate me. I know that my life is not my own. God saved me and brought me to this point, and now for the love of God I am selling out. Bringing out the old so that he can show me the new. I am stepping out on faith in Christ regardless of the consequences.

Jackson then confessed to the diversion and implicated appellant Council. In a typed follow-up statement to the FBI, dated February 12, 1990, Jackson specifically stated that the diversion of oil started in June, 1986. On the days following February 12, Jackson stood on the street corners of Fayetteville preaching to passersby. On February 15, he was arrested for driving without a license and in a dangerous manner. He was behaving so strangely that he was involuntarily committed to Cape Fear Valley Medical Center. Dr. Jerry Morrow examined him. His report contains this description of Jackson's mental condition:

> When [I] met with [Jackson] initially, he was quite angry, menacing with his hands as he repeatedly thrust his pointed finger at [me], physically resistant to any efforts to perform physical assessments (even monitoring his pulse), and verbally saying: "I'm dead, I was sent by God to you. The stone has been rolled away." With some effort and patience on the part of [me], he gradually became less resistant but then became completely passive, lying in bed flaccidly and passively allowing physical exam although not being responsive to any verbal requests.
>
> He became completely mute at this point.

Dr. Morrow concluded that Jackson suffered from delusions and that his judgment was "severely impaired." Morrow diagnosed a "schizoaffective disorder," and prescribed antipsychotic medication.

This involuntary admission to Cape Fear was not Jackson's first. He was committed from February 24 to March 7, 1989, because

[A]t this time he is experiencing hallucinations, conversing with God and was stating that Jesus was directing him that in order for his friend to speak with him, they must get Jesus's permission. The patient stated that he is a little Jesus, and he is not eating or sleeping adequately. He insists on going throughout the neighborhood day and night, knocking on doors, attempting to get the neighbors to follow him, and he is obviously in need of further psychiatric evaluation and possible hospitalization.

In addition, Jackson had been hospitalized twice in 1984 for similar mental illness.

### D.

On March 13, 1990, Jackson, Hayes, Council, Sellers, Al Holmes, and Alton Graham (the last two were other Sellers drivers) were named in a three-count indictment charging them with conspiracy to defraud the government and two substantive counts of fraud through presentation of false claims.

Jackson's counsel filed a notice of insanity defense and a motion to suppress Jackson's statements to the FBI. In support of his motion, Jackson cited his lack of mental capacity and hallucinations at the time the statements were made. These motions were mooted, however, when Jackson, along with Graham and Hayes, pled guilty to the conspiracy count and agreed to testify for the government. Ford, who was already incarcerated because of an unrelated conviction for conspiracy to distribute cocaine, was not indicted, but also chose to cooperate with the government.

In his plea agreement, Jackson agreed to "submit to a polygraph examination whenever requested by the United States Attorney" and "that the results of these examinations will be admissible against the defendant in a court of law." On June 13 and June 20, 1990, Jackson took polygraph tests conducted by a government examiner. On both occasions, the examiner concluded that Jackson was "not truthful" when he implicated Council in the diversion scheme.

On July 5, 1990, counsel for the remaining defendants received a copy of the polygraph report in the mail. That same day, the government moved in limine to prohibit admission of the polygraph evidence at trial. The defendants immediately responded, arguing that the government's confidence in the reliability of the evidence was demonstrated by the stipulation of admissibility against Jackson contained in the plea agreement. Furthermore, defense counsel asserted that the Assistant United States Attorney had informed him that a psychiatrist, Dr. Robert Rollins, would testify to Jackson's competence, and that Rollins had seen, among other materials, the polygraph results. Council argued that he had a right to inquire into all facts underlying the expert's opinion. The government did not dispute that Rollins had considered Jackson's failure of the polygraph test. In a pleading filed in support of its motion in limine, the government asserted that Jackson had "comment[ed] to Dr. Rollins about being upset over the test results" and that "Dr. Rollins has opined that Eugene Jackson's test results may be due to his mental condition, not to any possible untruthfulness." Nonetheless, the district court granted the government's motion, and ruled the evidence inadmissible.

Defendants also filed a motion in limine to prohibit Jackson's testimony because it was inherently incredible. The district court denied this motion.

### II.

The trial of Council, Holmes, and Sellers was held July 10–13, 1990. Ford, Hayes, and Graham took the stand in turn and told a consistent story. The diversions started in June, 1986, and Jackson solicited the involvement of each in the scheme, even going so far as to threaten Graham with the loss of his job if he refused. Only Ford offered any evidence implicating Council, and it was circumstantial: one time when Ford was to be paid by Jackson for diverted oil, Jackson said to wait because the money would be arriving shortly. Ford

saw Council drive up and go into the Sellers Oil facility, where Council spoke to Jackson for five to ten minutes, then left. Five minutes later, Jackson paid Ford.

Jackson was the star witness, but he told a different story. According to Jackson, Council instigated the diversions by asking him how much he wanted to make off of the Fort Bragg contract. These first discussions, according to Jackson, did not occur until August or September, 1986, two to three months after the other cooperating conspirators said the diversions began. Jackson stated that he at first refused Council's solicitation, and Council told him that if he left the job without making money, it was his own fault. Jackson eventually acceded to Council's pressure, and, *sometime after December 10, 1986*, he agreed to divert oil. He testified that he told Council he wanted to make $50,000, which Council said might be difficult because there were only four months left in the Fort Bragg contract.

Ford was fired by Sellers on January 4, 1987, after he was involved in an on-the-job traffic accident. This firing was six months after he said the conspiracy began, but a scant three weeks after Jackson's start-up date.

Jackson told of the various methods used to divert oil, and testified that Council was the purchaser of it. Jackson also provided the only evidence implicating Holmes.

At the conclusion of his direct examination, Jackson told a bizarre, disjointed story of the events leading up to his confession. He recounted that he had stolen some items from Council's yard in 1989, and the thefts were beginning to bother him. In February, 1990, he decided to go to Council, confess, and offer to pay for the stolen items. For some reason, he went to the local Coca–Cola plant and wandered around. When he came out, Council and a policeman were there to greet him, but the policeman let him go; he then went to the FBI to tell of the oil diversions.

Cross-examination was spirited. When confronted with the other conspirators' earlier beginning date, Jackson flatly stated that the others were wrong. He persisted even when shown his handwritten note to the FBI, which used the June 1986 date. Details of his episodes of mental illness were introduced, in some instances after he denied them (*e.g.*, he at first refused to admit that he was involuntarily committed on February 16, 1990). He acknowledged that he quit taking his antipsychotic medication when he left the hospital. He denied certain details of the other conspirators' testimony, including Graham's statement that he recruited Graham on threat of firing.

The government called Dr. Rollins to bolster Jackson's tattered credibility. Rollins conceded that Jackson suffered from a "schizophrenic affective disorder," which occasionally manifested itself in "very severe symptoms." He also admitted that Jackson had not continued to take the prescribed antipsychotic medication. Nonetheless, Rollins opined that Jackson was able to distinguish reality from imagination. The government offered a July 8, 1990, report stating Rollins' conclusions. This report was consistent with every matter common to it and Rollins' trial testimony; however, it also stated Rollins' opinion, which he did not repeat at trial, that Jackson was competent to be a witness. Council objected, but his objection was based on the exclusion of the polygraph evidence. The objection was overruled.

Council's cross-examination of Rollins was stunted by his inability to inquire about the polygraph test. At a bench conference, Council renewed his motion to be permitted to ask about it, but the court stuck to its initial ruling.

The government rested. The court granted Sellers' motion for judgment of acquittal, but denied Holmes' and Council's. Council and Holmes both took the stand in their own defense and denied involvement. Several Council employees testified that they had no knowledge of any involvement by Council in the diversions; other witnesses attested to Council's good character. At the conclusion of all the evidence, the district court granted a judgment of acquittal on one of the substantive counts as to all remaining defendants, leav-

ing one conspiracy and one substantive count each against Holmes and Council.

The jury deliberated for a day and a half. Holmes was acquitted notwithstanding Jackson's accusations. Council was acquitted of the substantive count, but was convicted of conspiracy. Council moved for a new trial and renewed his motion for judgment of acquittal. His motions were denied.

On November 5, 1990, Artice Council was sentenced to two years in prison and was fined $20,000. His oil company was fined $10,000 and placed on five years' probation. Council appeals.

Council moved for bail and a stay of the fine pending appeal. Over the government's objection, the district court granted the motion on December 3, 1990, finding that Council's appeal raised substantial questions of law, which, if resolved contrary to the district court's rulings, would likely result in reversal.

### III.

### A.

■ The Fourth Circuit rule is that evidence that the accused or a witness has taken a polygraph test is inadmissible. *United States v. Brevard,* 739 F.2d 180 (4th Cir.1984); *United States v. Smith,* 565 F.2d 292 (4th Cir.1977). However, this circuit's prior cases involve allegations that a criminal defendant has been prejudiced by the mention of a polygraph during trial.[1] None of them involve a defendant's attempt to impeach a government witness with the results of a government-initiated and government-administered polygraph examination.[2] Circumscribing a defen-

dant's cross-examination of government witnesses implicates the Confrontation Clause of the Sixth Amendment. *Olden v. Kentucky,* 488 U.S. 227, 231, 109 S.Ct. 480, 482, 102 L.Ed.2d 513 (1988); *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). Where it involves the government's most crucial witness, the constitutional concerns are especially heightened. *Dorsey v. Parke,* 872 F.2d 163, 166 (6th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 103, 107 L.Ed.2d 67 (1989). The rules of evidence are not necessarily coextensive with the Confrontation Clause. *See Idaho v. Wright,* —— U.S. ——, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990) (some otherwise-admissible hearsay can deprive defendant of his right to confrontation). Council urges us to recognize a Confrontation Clause exception to the general inadmissibility of polygraph results to accommodate an accused's attacks on the credibility of key government witnesses.

■ Council argues that this case can be distinguished from Fourth Circuit precedents because those cases involved polygraph results that had a prejudicially *inculpatory* effect. Certainly, before a scientific test should be used as inculpatory evidence, its reliability should be very high, because of the "aura of infallibility"[3] that surrounds scientific evidence. However, if a scientific test, though not unfailingly accurate, is reliable enough that its *exculpatory* result would create a reasonable doubt of a criminal defendant's guilt, Council argues that the Confrontation Clause demands that he be permitted to introduce it into evidence.

Council presents us with a weighty, difficult issue. The peculiar facts of his case

---

**1.** See, in addition to *Brevard* and *Smith, United States v. Herrera,* 832 F.2d 833 (4th Cir.1987); *United States v. Porter,* 821 F.2d 968 (4th Cir. 1987), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988); *United States v. Tedder,* 801 F.2d 1437 (4th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987); and *United States v. Morrow,* 731 F.2d 233 (4th Cir.), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984).

**2.** The closest case is *United States v. Grandison,* 780 F.2d 425, 434 (4th Cir.1985), *vacated on*

other grounds, 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987), in which we held that the government was not required to drop its prosecution because the polygraph results of a witness were favorable to the defendant; the admissibility of those results was not an issue.

**3.** *United States v. Alexander,* 526 F.2d 161, 168 (8th Cir.1975); *see Barefoot v. Estelle,* 463 U.S. 880, 926 n. 8, 103 S.Ct. 3383, 3412 n. 8, 77 L.Ed.2d 1090 (1983) (Blackmun, J., dissenting).

are compelling—a lone witness upon whom the government's case depends, whose credibility is heavily attacked, and who is disbelieved in part by the jury. However, at the expense of a cliche, we note that hard cases make bad law. This court's precedents preclude direct attacks on or bolstering of the credibility of a witness through evidence that the witness has taken a polygraph test. The broad exception Council seeks to create for an accused's attacks on government witnesses would, in our view, conflict with those precedents. Accordingly, though we acknowledge that other circuits have loosened their traditional strictures against polygraph evidence in recent years, we cannot follow as a panel of this court. Any such drastic departure from our previous practice must be made by an en banc court.[4]

In short, we find no error in the exclusion of Jackson's polygraph result insofar as it was offered to prove its own correctness, i.e. that Jackson was lying.

### B.

The government went one step further in the battle over Jackson's credibility, however. It offered the bolstering testimony of Dr. Rollins. He gave an expert opinion that Jackson was able to distinguish reality from imagination. When examining Jackson, Rollins had been informed of the polygraph results.

Fed.R.Evid. 705 reads:

The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

■ The data upon which an expert bases his opinion need not be admissible in evidence. Fed.R.Evid. 703. However, to counteract the potential advantage this liberalized rule confers on the proponent of the opinion, Rule 705 permits the cross-examiner to require the expert to reveal otherwise-inadmissible underlying information before the jury, subject only to Fed.R.Evid. 403's prejudice/probative value balancing test. *United States v. Gillis*, 773 F.2d 549, 553–554 (4th Cir.1985).

■ In *Gillis*, the defendant was charged with transporting stolen vehicles. He had been convicted of a similar charge in 1980, and the court ruled *in limine* that the government could not introduce evidence of the prior crime. At trial, however, the defendant offered the expert testimony of a psychologist who had examined the defendant in relation to the earlier trial and not since. On cross-examination, the

---

4. Circuits that have not yet permitted evidence of polygraph results for any purpose are now the decided minority. The Eleventh Circuit recently revisited polygraph tests en banc. *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir. 1989) (en banc). In *Piccinonna*, the court created two exceptions to the general inadmissibility of polygraph results—(1) if parties stipulate to admissibility in advance of the test, or (2) to impeach or corroborate the testimony of a witness. The second exception is further limited by a requirement of notice before trial of intent to use the evidence and by Rule 403's command that the probative value of the evidence outweigh its unfair prejudicial effect. Other circuits have admitted polygraph results under various sets of circumstances. *See Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988) (polygraph result admissible if relevant "to proof developed by probative evidence" and probative value of polygraph result outweighs prejudicial effect and possibility of juror confusion); *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir.1989) (polygraph may be admissible if offered for some purpose other than the correctness of its result); *United States v. Lynn*, 856 F.2d 430, 432–433 (1st Cir.1988) (terms of accomplice-witness' plea agreement, including requirement of polygraph test, may be revealed through cross-examination by defendant to show motive of witness to fabricate); *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir.1982) (polygraph evidence admissible if parties stipulate admissibility in advance of test); *United States v. Johnson*, 816 F.2d 918, 923 (3rd Cir.1987) (polygraph admissible to rebut defendant's claim that confession was coerced); *United States v. Kampiles*, 609 F.2d 1233, 1245 (7th Cir.1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980) (same); *United States v. Hall*, 805 F.2d 1410, 1415–1417 (10th Cir.1986) (defendant's failure of polygraph admissible to explain why police had not conducted more thorough investigation).

district court permitted the government to inquire about the circumstances under which the expert had seen the defendant, which necessarily revealed that the defendant had previously been charged with a similar offense. On appeal, this court found no error:

> We have recognized the importance of developing the factual basis of psychiatric testimony regarding mental responsibility, and have granted prosecutors wide latitude in crossexamining expert witnesses on the issue.

*Id.* at 554 (citations omitted). Certainly a criminal defendant is entitled to at least as wide a latitude as we have given prosecutors.

■ Full examination of the underpinnings of an expert's opinion is permitted because the expert, like all witnesses, puts his credibility in issue by taking the stand. Jackson's polygraph result is relevant to Rollins' credibility because Rollins must have necessarily discounted it to reach the opinion he stated in court. According to a government pleading, Rollins "opined that Eugene Jackson's test results may be due to his mental condition, not to any possible untruthfulness." Aside from the lack of conviction in this opinion ("may"), even its preferred explanation—that Jackson's polygraph failure was "due to his mental condition"—may well have failed to infuse the jury with confidence in Rollins' assessment of Jackson's credibility.

■ Council should have been permitted to fully explore the bases of Rollins' opinion, including inquiry about Jackson's polygraph result. Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes.

We emphasize that the polygraph result is admissible as an attack on Rollins' opinion,[5] not directly on Jackson's credibility, and the jury ought to be given a limiting instruction to that effect. Of course, the peculiarity of this case is that Rollins' opinion concerns Jackson's credibility. Nonetheless, the opinion is not exempted from searching cross-examination because of its subject matter.[6]

The convictions are reversed, and the case is remanded for a new trial.

REVERSED AND REMANDED.

---

5. As for the Rule 403 balancing, we believe that the "prejudicial effect" of this evidence is less than that we found tolerable in *Gillis.*

6. Council also argues that the admission of Dr. Rollins' written report prepared before trial, was impermissible bolstering by prior consistent statement before Rollins' credibility was attacked. *See* Fed.R.Evid. 801(d)(1)(B); *United States v. Bolick,* 917 F.2d 135 (4th Cir.1990). Appellant did not make this specific objection at trial, and we would not reverse on this unpreserved ground. *United States v. One 1971 Mercedes Benz,* 542 F.2d 912, 915 (4th Cir.1976); Fed.R.Evid. 103(a)(1).

Nonetheless, in the event Council is retried, we note that he is correct on this point. The weight given Rollins' testimony was central to the jury's determination of the vital issue of Jackson's credibility. It was improper for the government to introduce an extrajudicial statement, consistent with Rollins' trial testimony, except "to rebut an expressed or implied charge against the declarant of recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B).