966 F.2d 1443
 59 Fair Empl.Prac.Cas. (BNA) 192
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Glen Eyrie James MILLER, Plaintiff-Appellant,
v.
Michael DRENNON, EMS Coordinator; Delano Cantrell, EMS
Supervisor; Ronald T. Farr, Senior Paramedic (Acting
Supervisor); GORDON HARTWIG, County Administrator; Charles
A. Whitehead, Director of Public Safety; Paul A. Peters;
Roy J. Frick; Jerrod F . Howard; Harvey Wise; Robert O.
Sox; Alvin J. Neal; Art L. Guerry; Bruce L. Merchant,
Jr.; Lowell C. Spires, Jr., as members of the Lexington
County Council, all in their official capacities,
Defendants-Appellees,
and
Terry WALTERS, Defendant.
 No. 91-2166.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 3, 1992
Decided: June 19, 1992
 
 Argued: Orin G. Briggs, Ratchford & Associates, Columbia, South Carolina, for Appellant.
 Vance J. Bettis, Gignilliat, Savitz & Bettis Columbia, South Carolina, for Appellees.
 On Brief: Ashley B. Abel, Gignilliat, Savitz & Bettis, Columbia, South Carolina, for Appellees.
 Before WILKINSON, Circuit Judge, and BUTZNER and CHAPMAN, Senior Circuit Judges.
 PER CURIAM:
 
 
 1
 Glen Miller, a male paramedic, brought an action in district court claiming that his former employer, Lexington County, South Carolina, ("the County") violated his rights by scheduling him to work 24hour shifts in single bedroom substations with a female partner, contrary to his religious beliefs. The district court, after a five day bench trial, found for the County. Two principal issues are presented in Miller's appeal: whether allowing employees to swap shifts and take personal leave to avoid objectionable shift assignments is a reasonable accommodation of an employee's religious conflict; and whether an employer's neutral scheduling system which has an incidental effect on an employee's religious beliefs violates the first amendment. Because we find no reversible error, we affirm the judgment of the district court.
 
 I.
 
 2
 Miller was employed by the County as a Senior Paramedic in the County's Emergency Medical Services Division ("EMS") for fourteen years. In July 1988, the County changed the manner in which it assigned EMS personnel to the County's seven EMS substations. Prior to the change, EMS personnel were assigned primarily to one substation, and because some substations received more calls than others, personnel assigned to the busier substations worked overtime more frequently than other personnel. In order to reduce overtime and more fairly apportion work, the County adopted a rotating scheduling system, under which EMS personnel would be assigned to one substation for a nine day period, consisting of three 24-hour shifts, and would be rotated through the different substations.
 
 
 3
 When the County adopted the new rotation system, Miller and his wife met with the County administrator to express their concerns. Under the new rotation system, Miller could be assigned with a female partner to one of the County's three single bedroom substations which were staffed by only one team of two EMS personnel. Miller told the County that it would violate his religious beliefs to sleep unsupervised in a room in which a female other than his wife also sleeps.
 
 
 4
 The County administrator told Miller that, although the County could not make scheduling assignments based on gender, and could not afford to assign extra personnel to the problem substations to act as chaperons, the County was open to suggestions. Miller and his wife proposed that the County either relocate the problem substations to a fire department, or other place with personnel on duty 24 hours, or provide separate bedrooms. Miller also suggested that the County, as a temporary solution, allow EMS personnel to swap assignments.
 
 
 5
 The County administrator replied that the County would not relocate the substations because the substations were purposefully located to best serve the needs of the community, and that the County would not build separate bedrooms because the cost was prohibitive. The County, however, agreed to allow EMS personnel to swap assignments voluntarily, and provided Miller with the telephone numbers of EMS employees to facilitate his obtaining swaps. The administrator also stated that the County would install folding walls between the bunks at the problem substations, cost permitting, and the County later spent $5,000 installing such walls. Further, the administrator informed Miller that he could sleep in the ambulance, if he preferred not to sleep in the substation, or in a pop-up camper which a private citizen apparently had offered for Miller's use. The County also told Miller that he could ask for annual leave when he was scheduled to work with a female partner and was unable to swap.
 
 
 6
 In December 1988, Miller was suspended for two days for refusing to work with a female partner. Miller originally had been assigned to work at the Batesburg substation, an unsupervised single bedroom substation, with a male partner. When the male partner reported to work several hours late, he was relieved of duty and replaced with Terry Walters, a female, who was the extra crew member on duty that day. Miller refused to work his assigned shift with Walters and was suspended for two days.
 
 
 7
 In February 1989, Walters complained to the County that Miller had made disparaging statements about her to a newspaper reporter. The County investigated the claim, found Walter's story more credible than Miller's, and suspended Miller for two days.
 
 
 8
 In March 1989, Miller, upset by the continuing possibility that he would be assigned to an unsupervised substation with a female partner, agreed to be placed on sick leave. On May 5, 1989, Miller's psychologist informed the County that Miller's anxiety and depression had improved and that he was capable of employment if he was not placed in the same position facing the same conflict as to sleeping arrangements. The County put Miller back to work in the dispatch area until July 17, 1989, at which time he was placed on paid leave. When Miller's paid leave ran out one week later, he was placed on unpaid leave, and was terminated when he did not return to work after one year of unpaid leave of absence.
 
 
 9
 Miller brought suit in district court asserting two primary claims: (1) religious discrimination under Title VII of the Civil Rights Act of 1964; and (2) violation of the free exercise clause of the first amendment.* The district court granted judgment for the County after a five day bench trial.
 
 II.
 
 10
 Section 701(j) of Title VII requires employers to"reasonably accommodate" the religious beliefs or practices of their employees unless doing so would cause the employers to suffer undue hardship. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977). The district court found that the County fulfilled its duty of reasonable accommodation by allowing Miller to swap shifts with other EMS personnel and use personal leave to avoid objectionable assignments. The district court further found that the County exceeded its duty of reasonable accommodation by installing folding walls at the three objectionable substations and by allowing Miller to sleep in the ambulance or in a pop-up camper. The court's conclusion that the County offered Miller a reasonable accommodation is ultimately a finding of fact and will not be disturbed unless it is clearly erroneous. See Hudson v. Western Airlines, Inc., 851 F.2d 261, 266 (9th Cir. 1988).
 
 
 11
 Miller claims that the County was guilty of religious discrimination because it would not guarantee Miller that he would never be assigned to one of the three problem substations with a female EMS employee. Miller argues that the County should have agreed to an accommodation of his situation because it would have caused the County to incur no undue hardship. This assertion is vigorously contested by the County. We need not reach this issue, however, because we find no clear error in the district court's conclusion that the County offered Miller a reasonable accommodation of his religious belief. Once an employer has offered any reasonable accommodation, it need not show that the accommodation offered by the employee would cause undue hardship to the employer. Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986).
 
 
 12
 The Supreme Court examined the extent of an employer's reasonable accommodation in Hardison, and concluded that the employer, which operated its airline maintenance facility 24 hours a day, seven days a week, had "made reasonable efforts to accommodate" an employee who, for religious reasons, refused to work on Saturdays. Id. at 77. In an effort to accommodate the employee, the employer had authorized the union steward to help the employee obtain shift swaps and had given the employee his religious holidays off. The Court also indicated that the employer's scheduling system, in which shifts were assigned on the basis of seniority, was itself a "significant accommodation" of the plaintiff's needs. Id.
 
 
 13
 Other circuit courts have held that a rotating shift scheduling system which allows employees to swap shifts voluntarily is a reasonable accommodation of the employees' religious beliefs. The Tenth Circuit held that allowing firefighters to avoid objectionable shift assignments by taking vacation leave or unpaid leave, or by trading shifts voluntarily, was a reasonable accommodation, even though the fire department imposed certain restrictions on the firefighters' ability to take time off. United States v. City of Albuquerque, 545 F.2d 110 (10th Cir. 1976), cert. denied, 433 U.S. 909 (1977). The Fifth Circuit examined a hospital's rotating shift schedule of pharmacists in Brener v. Diagnostic Ctr. Hosp., 671 F.2d 141 (5th Cir. 1982), and held that allowing pharmacists to trade shifts was a reasonable accommodation.
 
 
 14
 The accommodations which the County offered Miller were at least as significant as those which have been upheld as reasonable. The County allowed Miller to swap shifts with other EMS personnel and gave him the telephone numbers of his co-workers to aid Miller in obtaining swaps, and it also allowed him to apply for personal leave to avoid an objectionable assignment. As in Albuquerque, reasonable accommodation did not fail simply because Miller's ability to avoid an objectionable assignment was not absolute, but was dependent on the willingness of other employees to swap and subject to certain minimum staffing requirements.
 
 
 15
 The County also spent $5,000 installing folding walls in each of the three single bedroom substations to provide privacy, but this effort at accommodation did not satisfy Miller because the walls did not extend fully from the floor to ceiling and could not be locked. Finally, the County told Miller that he could sleep in the ambulance or in a pop-up camper provided to him if he desired, but Miller claims that he would have been "cramped" sleeping in the ambulance and that it would have smelled of medicinal fumes. Miller also contends that the pop-up camper would have been difficult to move from substation to substation.
 
 
 16
 The County is not required to provide absolute accommodation, only a "reasonable accommodation," and Miller has a duty to cooperate with the County's efforts to accommodate. Philbrook, 479 U.S. at 69. Miller may not brush aside the County's good faith and reasonable attempts to accommodate his religious belief and stubbornly insist that the County adopt his solution. The determination of whether an employer has offered a reasonable accommodation depends on the facts of each case, Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987), cert. denied, 485 U.S. 989 (1988), and we cannot say that the district court was clearly erroneous in finding that the County offered Miller a reasonable accommodation.
 
 III.
 
 17
 We next turn to Miller's claim that the County's failure to accommodate his religious beliefs violated the free exercise clause of the first amendment. Miller contends that we must evaluate the County's rotating scheduling system under the balancing test set forth by the Supreme Court in Sherbert v. Verner, 374 U.S. 398 (1963), and uphold it only if the County can show a compelling governmental interest in the scheduling policy. We agree with the district court that we must evaluate the policy under Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872 (1990), which requires us to uphold the policy if it is a neutral policy and not aimed at prohibiting Miller's exercise of religion.
 
 
 18
 In Smith, the Supreme Court held that the first amendment is not violated by a neutral, "generally applicable and otherwise valid provision" which does not as its object prohibit the exercise of religion. Id. at 878. Because it is clear that the County implemented the policy to reduce costs and more fairly apportion work and not to prohibit the exercise of religion, Miller's claim that the scheduling policy violated his first amendment rights must fail.
 
 
 19
 We do not agree with Miller that Smith is confined to cases challenging a criminal statute, because although Smith did involve a criminal statute, the Court did not indicate that its holding should be so narrowly limited. Other circuit courts agree, and have evaluated, under Smith, claims not involving criminal statutes. See Ryan v. United States Dep't of Justice, 950 F.2d 458, 461 (7th Cir. 1991) (FBI agent challenged his dismissal for religiously based refusal to investigate a claim), petition for cert. filed, (U.S. March 9, 1992) (No. 917546); Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 472 (8th Cir. 1991) (church challenged zoning ordinance excluding churches from town's business district). Further, the Smith Court implied that the Sherbert balancing test should be used to evaluate only claims involving the denial of unemployment compensation. Smith, 494 U.S. at 883. Therefore, we uphold the district court's finding for the County on this issue.
 
 IV.
 
 20
 Miller also challenges several of the district court's factual findings, claiming that the district court misconstrued the facts, gave too much weight to the County's evidence and too little to Miller's evidence. Miller contends that the district court failed to recognize that the County discriminated against Miller in its use of the scheduling system, because, according to Miller, he was not allowed the wide latitude to change his work schedule that other employees had. Miller also contends that the district court misinterpreted the circumstances surrounding Miller's two suspensions.
 
 
 21
 Miller merely seeks to reargue the evidence. The district court had the opportunity to hear and weigh the evidence, and its conclusion will not be disturbed absent clear error. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969). We cannot say that the district court's findings are clearly erroneous, because after reviewing the "entire evidence," we are not "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).
 
 
 22
 Finally, Miller argues that the district court made two evidentiary errors. First, Miller contends that the district court erroneously excluded evidence of employee fraternization contrary to County policy. Miller wanted to show that several County employees had heard rumors of sexual fraternization in an effort to prove that the County must have known about the situation but refused to do anything about it. As the County points out, however, such testimony would not have helped Miller prove his claim that the County violated Miller's constitutional rights by scheduling him to work with female partners in single bedroom substations. We cannot say that the district court abused its discretion in refusing to admit such evidence.
 
 
 23
 Miller also challenges the district court's admission of the results of a co-worker's polygraph test. Miller, at trial and on appeal, claimed that the County arbitrarily disciplined him for allegedly slandering Walters, a female co-worker. In response, the County introduced evidence at trial showing the steps the County had taken in investigating the claim, and the evidence upon which it based its decision to discipline Miller, including the fact that, while Miller refused to take a polygraph exam, Walters took and passed a polygraph.
 
 
 24
 While we have never allowed parties to use the fact that a witness has taken a polygraph exam, or the results of that exam, to attack or bolster the credibility of that witness, we have allowed parties to use the results of a polygraph for other reasons. See United States v. A & S Council Oil Co., 947 F.2d 1128, 1135 (4th Cir. 1991) (criminal defendant allowed to introduce evidence that a government witness failed a polygraph exam to attack the government's expert who gave an opinion of the witness' credibility).
 
 
 25
 In the present case, the polygraph evidence was introduced not to bolster Walters' credibility, or attack Miller's, but to rebut Miller's claim that the County acted arbitrarily in suspending him. Therefore, the polygraph result was admissible. In any event, the district judge's comments at trial indicate that he gave little weight to the entire incident, and if the admission was error, it was harmless.
 
 V.
 
 26
 Upon a careful review of the record, we find that the district court made no errors of law and no clearly erroneous factual findings, and we affirm.
 
 AFFIRMED
 
 
 *
 Miller also brought claims alleging violations of his rights of free speech, free association, due process, and equal protection. These claims have been abandoned on appeal